UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| LISA DECLUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CV1076 CAS(LMB) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Lisa Declue for Supplemental Security Income under Title XVI of the Social Security Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 16). Defendant has filed a Brief in Support of the Answer. (Doc. No. 19).

### Procedural History

On November 9, 2006, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on August 8, 2003. (Tr. 126-29). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated October 17, 2008. (Tr. 93-96, 80-90). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council, which was denied on May 27, 2009. (Tr. 4, 1-3). Thus, the decision of the ALJ stands as the final decision

of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

**Evidence Before the ALJ**

A.      **ALJ Hearing**

Plaintiff's administrative hearing was held on September 23, 2008.  (Tr. 42).  Plaintiff was present and was represented by counsel.  (Id.).  Vocational expert Darryl Taylor was also present by telephone.  (Tr. 43).  The ALJ began the hearing by admitting a number of exhibits into the record.  (Tr. 44).  Plaintiff requested additional time in which to submit records from plaintiff's pain management doctor, Dr. Naushad.  (Id.).  The ALJ indicated that he would give plaintiff ten days to submit these records.  (Tr. 45).

Plaintiff's attorney then made an opening statement, in which he stated that plaintiff has been diagnosed with a herniated lumbar[1] disc with radicular symptoms going down the bilateral legs, left carpal tunnel syndrome,[2] migraine headaches, depression, anxiety, and diffuse arthropathy[3] in her lumbar spine.  (Tr. 46).  Plaintiff's attorney indicated that plaintiff has been

---

[1]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[2]The most common nerve entrapment syndrome, characterized by paresthesias, typically nocturnal, and sometimes sensory loss and wasting in the median nerve distribution in the hand.  Stedman's Medical Dictionary, 1892 (28th Ed. 2006).

[3]Any disease affecting a joint.  Stedman's at 161.

prescribed Vicodin,[4] Percocet,[5] Methocarbamol,[6] Tramadol,[7] and Amitriptyline.[8] (Id.). He argued that plaintiff's pain affects her ability to sit, stand, walk, and maintain an eight-hour workday. (Id.). Plaintiff's attorney stated that plaintiff's depression, anxiety, and side effects of her medication affect her ability to perform the mental aspects of work-related activity. (Id.). He argued that plaintiff's combination of impairments prevent her from performing even sedentary unskilled work. (Tr. 47).

The ALJ then examined plaintiff, who testified that she was thirty-eight years of age and was married. (Id.). Plaintiff stated that she lives with her husband, two children, and her niece. (Id.). Plaintiff testified that her children are aged twelve and eight and her niece is seventeen. (Id.). Plaintiff stated that she completed the twelfth grade. (Tr. 48). Plaintiff testified that she was right-handed, was five-feet two-inches tall, and weighed 198 pounds. (Id.).

Plaintiff stated that she did not have any difficulty reading or performing simple arithmetic. (Id.). Plaintiff testified that she was never in the military and that she never served any time in jail or prison. (Id.). Plaintiff stated that the only household income came from her husband, who was receiving unemployment benefits at the time of the hearing. (Tr. 49). Plaintiff testified that she

---

[4]Vicodin is indicated for the relief of moderate to moderately severe pain. See Physician's Desk Reference (PDR), 526 (59th Ed. 2005).

[5]Percocet is indicated for the relief of moderate to moderately severe pain. See PDR at 1223.

[6]Methocarbamol is a muscle relaxer indicated for the relief of muscle pain and spasms. See PDR at 809.

[7]Tramadol is indicated for the short-term management of acute pain. See PDR at 2550.

[8]Amitriptyline is an antidepressant indicated for the treatment of depression. See PDR at 2213.

has never drawn workers' compensation benefits.  (Id.).  Plaintiff stated that she has never applied for unemployment benefits.  (Id.).

Plaintiff testified that she last worked in August of 2003 as a cashier.  (Id.).  Plaintiff stated that she worked for Karsch supermarket in Potosi, Missouri, as a cashier.  (Id.).  Plaintiff testified that she worked at this position for about four months.  (Tr. 50).  Plaintiff stated that she quit the position when she became pregnant with her daughter.  (Tr. 51).

Plaintiff stated that prior to working at Karsch, she worked at Hardee's.  (Tr. 50).  Plaintiff testified that she worked the food line and worked as a cashier at this position.  (Id.).  Plaintiff stated that she was a Crew Leader at Hardee's, which allowed her to assign some duties such as stocking.  (Id.).  Plaintiff testified that she did not have the authority to grant requests for time off, hire, or fire.  (Id.).  Plaintiff stated that she worked at this position from February of 1995 until October 1995.  (Tr. 51).  Plaintiff testified that she quit this position when she became pregnant with her son.  (Id.).

Plaintiff testified that from 1988 to 1989 she worked as a Certified Nursing Assistant ("CNA") at Georgeanne Gardens in Potosi, Missouri.  (Id.).  Plaintiff stated that she helped residents with their daily activities by lifting, dressing, showering, and feeding them.  (Id.).  Plaintiff testified that she quit this position after she had a miscarriage.  (Tr. 52).  Plaintiff stated that she worked at this position right after high school and did not have any jobs prior to this.  (Id.).

Plaintiff testified that she lifted twenty-five to thirty pounds as a cashier.  (Id.).  Plaintiff stated that she was required to stock, and that she lifted cases of soda.  (Id.).  Plaintiff testified that she frequently lifted about twenty pounds and lifted a maximum weight of about thirty

pounds as a cashier. (Id.). Plaintiff stated that she stood constantly at this position. (Id.). Plaintiff testified that she walked about five hours out of an eight-hour work-day. (Tr. 53).

Plaintiff stated that, when she worked at Hardee's, she lifted more but stood and walked about the same amount as she did as a cashier. (Id.).

Plaintiff testified that, as a CNA, she stood and walked about six hours in an eight-hour work-day. (Id.). Plaintiff stated that she only sat about one hour during the work-day, including her half-hour lunch period. (Id.).

Plaintiff testified that in 2003, Dr. Hardigan with Healthway Primary Care took her off work for a couple weeks and then prescribed a leg brace for her to wear while she was working. (Tr. 54).

Plaintiff stated that she suffers from lower lumbar chronic pain, arthritis in her spine, numbness in her legs, and pain that shoots from her lower back down her legs. (Tr. 55). Plaintiff testified that her left leg occasionally goes out. (Id.). Plaintiff stated that she takes Methocarbamol for muscle spasms, Valium[9] for anxiety, Vicodin, Neurontin[10] for nerve damage, Amitriptyline for pain and prevention of migraines, Tramadol for pain, Ambien[11] for difficulty sleeping, Prozac[12] for depression, and Lidoderm patches.[13] (Id.).

---

[9]Valium is indicated or the management of anxiety disorders or for the short-term relief of the symptoms of anxiety. See PDR at 2957.

[10]Neurontin is indicated for the management of postherpetic neuralgia. See PDR at 2590.

[11]Ambien is indicated for the short-term treatment of insomnia. See PDR at 2980.

[12]Prozac is a psychotropic drug indicated for the treatment of major depressive disorder. See PDR at 1874.

[13]Lidoderm patch is indicated for relief of pain associated with post-herpetic neuralgia. See PDR at 1216.

Plaintiff testified that, during the hearing, she was experiencing back pain that she rated as a seven on a scale of one to ten. (Tr. 56). Plaintiff stated that her back pain occasionally reaches a ten. (Id.).

Plaintiff testified that she suffers from anxiety. (Id.). Plaintiff stated that, on days where she experiences a lot of pain, she cries and becomes very emotional. (Id.).

Plaintiff testified that Dr. J. Paul Tindall told her that she would never be able to perform the work that she used to do. (Id.).

Plaintiff stated that she does not smoke, drink alcohol, or use illegal drugs. (Id.). Plaintiff testified that she drives short distances. (Tr. 57). Plaintiff stated that she is unable to drive long distances because she experiences pain, numbness, and stiffness if she sits in one position for a long period. (Id.).

Plaintiff testified that she performs a minimal amount of housework. (Id.). Plaintiff stated that she straightens up, makes her children's beds, makes her own bed, and washes dishes if there are not many. (Id.). Plaintiff testified that she has to take breaks if there are a lot of dishes. (Id.). Plaintiff stated that her niece and her children help with the housework. (Id.). Plaintiff testified that she is unable to lift clothes into the washer or dryer. (Id.). Plaintiff stated that her niece or children help her with the lifting and she folds the clothes. (Id.). Plaintiff testified that she occasionally cooks and vacuums. (Id.). Plaintiff stated that she does not do any yard work. (Tr. 58).

Plaintiff testified that she enjoys reading and walking. (Id.). Plaintiff stated that Dr. Naushad recommended that she try to walk ten minutes a day. (Id.). Plaintiff testified that she tries to walk every day and that she usually walks about two blocks. (Id.).

- 6 -

Plaintiff stated that she is only able to lift about ten pounds. (Id.).

Plaintiff testified that she used to enjoy sewing but she is no longer able to sew. (Id.). Plaintiff stated that she occasionally sewed at the time she completed her application for benefits. (Tr. 59). Plaintiff testified that she attends church once a week. (Id.). Plaintiff stated that she does not have any difficulty getting along with her family, friends, or authority figures. (Id.). Plaintiff testified that she shops for groceries with her niece every Sunday. (Id.).

Plaintiff stated that she experiences difficulty bathing. (Tr. 60). Plaintiff testified that it is difficult for her to step over the shower and shave her legs. (Id.). Plaintiff stated that she also experiences difficulty holding her hand up long enough to style her hair due to her lower back pain. (Id.).

Plaintiff testified that she is able to stand for about ten minutes and sit for about fifteen minutes. (Tr. 60-61). Plaintiff stated that she lies down at least once a day. (Tr. 61). Plaintiff testified that her medication makes her dizzy and drowsy. (Id.).

Plaintiff stated that she is able to hold her arms straight out but she is unable to raise them above her head. (Id.). Plaintiff testified that she has difficulty picking up objects like coins from a table. (Id.).

Plaintiff stated that her pain is primarily in her lower back, with numbness in her legs. (Id.). Plaintiff testified that performing any activity increases her back pain. (Id.). Plaintiff stated that doing household chores and sitting cause her pain to increase. (Tr. 62). Plaintiff testified that changing positions frequently relieves the pain. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she has fallen on several occasions because her left leg gives out. (Id.). Plaintiff stated that her leg gives out with no

warning when she is walking or standing.  (Id.).

Plaintiff testified that she has migraine headaches.  (Id.).  Plaintiff stated that, when she has a migraine, she experiences severe pain, sensitivity to light and sound, and nausea.  (Tr. 63). Plaintiff testified that she experiences about two migraines a week.  (Id.).  Plaintiff stated that the migraines typically last about twelve hours, although they have lasted as long as several days. (Id.).  Plaintiff testified that she takes medication to prevent migraines and she takes pain medication.  (Id.).  Plaintiff stated that she has also gone to the emergency room, where she was given a shot.  (Id.).  Plaintiff testified that, when she has a migraine, she lies in bed until the episode is over.  (Id.).

Plaintiff testified that she experiences depression.  (Id.).  Plaintiff stated that she becomes very sad, especially if she is unable to do something.  (Id.).  Plaintiff testified that she does not experience suicidal or homicidal thoughts.  (Tr. 64).  Plaintiff stated that she changes clothes every day.  (Id.).  Plaintiff testified that she bathes every other day, although she used to bathe every day.  (Id.).  Plaintiff stated that she eats one to two meals a day.  (Id.).  Plaintiff testified that she used to eat three meals a day and snack between meals, but her medication has caused a loss in her appetite.  (Id.).  Plaintiff described her relationship with her husband as "good."  (Id.). Plaintiff testified that her mood is usually good, although she becomes angry or aggravated due to pain once or twice a week.  (Tr. 65).

Plaintiff stated that she also experiences anxiety.  (Id.).  Plaintiff testified that she becomes nervous and feels out of control.  (Id.).  Plaintiff stated that she has panic attacks, during which her heart races, she is short of breath, and she breaks out in a cold sweat.  (Id.).  Plaintiff testified that she experiences panic attacks about every four to five days.  (Tr. 66).  Plaintiff stated that she

usually experiences panic attacks when she is having increased back pain.  (Id.).

Plaintiff testified that she is usually able to use utensils and cups, although she has dropped glasses with her left hand.  (Id.).  Plaintiff stated that she underwent left carpal tunnel syndrome surgery in October of 2004.  (Id.).  Plaintiff testified that she still experiences symptoms relative to this condition, including numbness in her fingertips.  (Id.).

Plaintiff stated that she is unable to bend or stoop without experiencing severe pain in her back that shoots down her legs.  (Tr. 67).

Plaintiff testified that she experiences side effects due to her medications, including dry mouth, dizziness, drowsiness, and memory loss.  (Id.).

Plaintiff stated that she sees a pain management doctor who prescribes pain medication.  (Id.).  Plaintiff testified that this doctor has also administered epidural steroid injections, which were not effective.  (Id.).  Plaintiff stated that she commonly forgets what she is doing and has to backtrack to remember.  (Id.).  Plaintiff testified that her doctor wants to try a new procedure called a medial branch block.[14]  (Tr. 68).  Plaintiff stated that she was scheduled to undergo this procedure on October 1, 2008.  (Id.).

The ALJ then examined vocational expert Darryl Taylor, who testified that he had heard plaintiff's testimony.  (Tr. 69).  Mr. Taylor described plaintiff's vocational history as cashier, which was light and semi-skilled.  (Tr. 70).  Mr. Taylor stated that plaintiff performed additional duties in stocking that would cause the position to be classified as medium exertional level.  (Id.).  Mr. Taylor testified that plaintiff worked as a cook, which was classified as light and semi-skilled.

_____

[14]Medial branch nerves are small nerves in the facet joints in the spine.  A medial branch block temporary interrupts the pain signal being carried by the medial branch nerves that supply a specific facet joint.  See Stedman's at 258.

(Id.). Mr. Taylor stated that plaintiff also worked as a CNA, but this work was performed prior to the fifteen-year period. (Id.). Mr. Taylor testified that plaintiff has not acquired any skills that could be utilized in other jobs. (Id.).

The ALJ asked Mr. Taylor to assume a hypothetical individual with plaintiff's background and the following limitations: lift or carry twenty pounds occasionally and ten pounds frequently; stand or walk six hours out of eight; sit six hours out of eight; occasionally climb stairs and ramps; never climb ropes, ladders or scaffolds; stoop, kneel, and crouch occasionally; never crawl; and occasionally reach overhead. (Tr. 71). Mr. Taylor testified that such an individual would be able to perform plaintiff's past work except the additional stocking duties of the cashier position. (Id.). Mr. Taylor stated that some cashier positions require stocking and others do not. (Id.). Mr. Taylor testified that the individual could perform cashier duties without stocking, and plaintiff's past position as a cook. (Id.).

The ALJ next asked Mr. Taylor to assume an individual who was able to lift a maximum of ten pounds, stand or walk two hours out of an eight-hour day, and sit six hours out of an eight-hour day. (Id.). Mr. Taylor testified that the individual would not be able to perform plaintiff's past work, but would be able to perform other sedentary, unskilled positions such as production inspector or checker. (Tr. 72). Mr. Taylor stated that approximately 1,000 of such positions exist in Missouri. (Id.).

The ALJ then asked Mr. Taylor to assume an individual who was able to sit six hours, but would be required to change positions every hour; could only occasionally perform fine finger manipulation; was able to understand, remember and carry out at least simple instructions in non-detailed tasks; and was able to maintain concentration for two-hour segments over an eight-hour

period.  (Tr. 73).  Mr. Taylor testified that such an individual would be unable to perform the jobs he identified previously or any other jobs.  (Tr. 74).  Mr. Taylor stated that all sedentary unskilled positions require frequent use of the fingers and hands.  (Id.).

**B.  Relevant Medical Records**

The record reveals that plaintiff presented to J. Paul Tindall, D.O. on February 17, 2006, with complaints of occasional numbness from the waist down, fatigue caused by her blood pressure medication, and crying related to her chronic pain.  (Tr. 195).  Dr. Tindall noted that a nerve conduction study revealed a decreased signal on the left side and that plaintiff had been treated with nerve blocks and other medications.  (Id.).  Dr. Tindall's assessment was lumbar disc herniation, depression, hypertension, and fatigue.  (Id.).  He prescribed Pamelor[15] and Celexa.[16]  (Id.).

Plaintiff presented to Dr. Tindall on April 7, 2006, at which time she reported that her blood pressure and pain and numbness had gotten worse.  (Tr. 196).  Plaintiff also reported frequent migraine headaches and insomnia.  (Id.).  Dr. Tindall's assessment was lumbar disc herniation, hypertension, and insomnia.  (Id.).  He increased plaintiff's Pamelor.  (Id.).

Plaintiff presented to Washington County Memorial Hospital emergency room on April 15, 2006, after being involved in an automobile accident.  (Tr. 188).  Plaintiff complained of lower back pain and neck pain.  (Id.).  Plaintiff underwent imaging of her cervical spine, which revealed no abnormalities.  (Tr. 192).  Plaintiff was given Toradol[17] and was discharged in improved condition.

---

[15]Pamelor is an antidepressant indicated for the treatment of depression.  See PDR at 1925.

[16]Celexa is indicated for the treatment of depression.  See PDR at 1270.

[17]Toradol is a non-steroidal anti-inflammatory drug indicated for the short-term management of moderately severe acute pain that requires analgesia at the opioid level.  See PDR

(Tr. 189).

Plaintiff presented to Dr. Tindall on April 19, 2006, at which time she reported soreness in the left chest wall where the seat belt hit, and lower back pain. (Tr. 197). Plaintiff continued to complain of leg paresthesias and periodic weakness. (Id.). Dr. Tindall noted that an MRI plaintiff underwent one year prior revealed L3/L4/ L5/S1 disc disease. (Id.). Dr. Tindall's assessment was lumbar disc herniation, muscle strain, and a contusion. (Id.). He prescribed Soma,[18] Panlor, and Percocet, and recommended physical therapy. (Id.). Plaintiff attended physical therapy. (Tr. 186).

Plaintiff presented to Dr. Tindall on May 26, 2006, at which time she complained of low back pain and insomnia. (Tr. 198). Plaintiff reported that her physical therapist indicated that she needed a new back brace. (Id.). Dr. Tindall's assessment was lumbar disc herniation and insomnia. (Id.). He prescribed a new back brace, refilled the Percocet, and started plaintiff on Ambien. (Id.).

Plaintiff presented to Dr. Tindall on August 25, 2006, at which time she reported that physical therapy did not help. (Tr. 199). Plaintiff complained of constant pain, pain in the coccyx,[19] and numbness in the bilateral legs, the left leg greater than the right. (Id.). Dr. Tindall's assessment was lumbar disc herniation and insomnia. (Id.). He refilled plaintiff's Percocet and Ambien and ordered an MRI of the lumbar spine. (Id.).

Plaintiff underwent an MRI of the lumbosacral spine on August 29, 2006, which revealed diffuse facet arthropathy, with no significant disc bulge, herniations, or stenosis. (Tr. 184).

---

at 2933.

[18]Soma is indicated for the relief of discomfort associated with acute, painful musculoskeletal conditions. See PDR at 1976.

[19]The small bone at the end of the vertebral column that articulates above with the sacrum. See Stedman's at 403.

Plaintiff saw Dr. Tindall on October 17, 2006, at which time she continued to complain of tingling in her back and numbness in her legs. (Tr. 200). Dr. Tindall's assessment was lumbar disc herniation. (Id.). Dr. Tindall refilled plaintiff's Panlor. (Id.). He recommended that plaintiff see a neurologist to investigate her left leg numbness with a normal lumbosacral MRI. (Id.).

Plaintiff saw Dr. Tindall on December 19, 2006, at which time plaintiff continued to complain of chronic back pain and numbness in her legs. (Tr. 227). Dr. Tindall indicated that plaintiff's medications did not appear to be helping. (Id.). Dr. Tindall's assessment was lumbar disc herniation. (Id.). He recommended that plaintiff see a neurologist. (Id.).

Plaintiff presented to Riaz A. Naseer, M.D. on January 6, 2007, for a neurology examination. (Tr. 203-07). Upon physical examination, Dr. Naseer noted that plaintiff came to the office without any assistive device and had no difficulties getting on and off the examination table. (Tr. 204). Plaintiff had normal mental status, station, and gait. (Id.). Plaintiff's motor and sensory exam was normal. (Id.). Plaintiff had full range of motion of the shoulders, knees, wrists, hips, ankle, and cervical spine. (Tr. 206-07). Plaintiff's lumbar spine range of motion was limited to sixty degrees on flexion-extension, with normal range of motion ninety degrees; and ten degrees on lateral flexion with normal range of motion of twenty-five degrees. (Tr. 207). Dr. Naseer's impression was chronic back pain with history of receiving epidural steroid injections and negative MRI for herniated disc, but with findings suggestive of facet arthropathy. (Tr. 204). Dr. Naseer stated that plaintiff was able to use her hands for fine finger functions; ambulate without any assistive device; sit, stand and walk; and lift, carry, and handle objects. (Id.).

Joan Singer, Ph.D. completed a Psychiatric Review Technique on January 19, 2007. (Tr. 214-24). Dr. Singer found that plaintiff suffered from depression, which did not satisfy diagnostic criteria.

(Tr. 217).  Dr. Singer expressed the opinion that plaintiff's depression caused no functional limitations.  (Tr. 222).

Plaintiff saw Dr. Tindall on January 29, 2007, at which time plaintiff complained of low back pain, pain shooting down her legs, muscle spasms, and occasional numbness in her legs.  (Tr. 226).  Dr. Tindall's assessment was lumbar disc herniation.  (Id.).  He indicated that plaintiff was scheduled to see a neurosurgeon the following week.  (Id.).

Plaintiff saw Dr. Tindall on March 14, 2007, at which time she complained of cold symptoms.  (Tr. 225).  Dr. Tindall's assessment was lumbar disc herniation and cough.  (Id.).  He refilled plaintiff's Percocet and Soma.  (Id.).

Plaintiff saw Dr. Tindall on April 20, 2007, at which time she complained of pain shooting down her legs.  (Tr. 228).  Plaintiff reported that she had recently fallen when her legs gave out.  (Id.).  Dr. Tindall refilled plaintiff's Percocet and Soma and referred her to a neurosurgeon for an evaluation.  (Id.).

Plaintiff saw Dr. Tindall on July 27, 2007, at which time she complained of chronic pain.  (Tr. 236).  Dr. Tindall noted that plaintiff had tried physical therapy and steroid shots but nothing had worked long-term, and that the neurosurgeon told plaintiff to wait until the pain worsened before having surgery.  (Id.).  Dr. Tindall's assessment was lumbar disc herniation.  (Id.).  He refilled the Percocet and Soma, and started plaintiff on Lyrica[20] for the neuropathic pain in her legs.  (Id.).

Plaintiff saw Dr. Tindall on October 2, 2007, at which time plaintiff reported getting dizzy and having cold sweats.  (Tr. 235).  Plaintiff was jittery, irritable, and depressed, and indicated that the

---

[20]Lyrica is indicated for the treatment of neuropathic pain.  See PDR at 2527.

Paxil[21] was not working. (Id.). Dr. Tindall's assessment was lumbar disc herniation, anxiety, and depression. (Id.). Dr. Tindall discontinued the Paxil and prescribed Lexapro.[22] (Id.). He refilled plaintiff's Percocet, Soma, and Neurontin. (Id.).

Plaintiff presented to the Advanced Pain Center on January 18, 2008, with complaints of chronic lower back pain with bilateral radiculopathy[23] and numbness and tingling in both legs. (Tr. 237). Abdul N. Naushad, M.D. indicated that plaintiff's pain was moderate and interfered only with some daily activities. (Id.). Plaintiff reported that her pain interfered with sleep. (Id.). Musculoskeletal examination revealed a normal cervical and thoracic spine. (Tr. 238). Plaintiff had some tenderness in the midline at L4 and L5, with normal muscle strength, reflexes, and sensation. (Id.). Plaintiff's straight leg raising was positive bilaterally. (Id.). Dr. Naushad diagnosed plaintiff with lumbar discogenic pain and lumbar facet arthropathy. (Tr. 239). He advised plaintiff to limit lifting to fifteen to twenty pounds, and to avoid squatting, kneeling, climbing, or twisting. (Id.). Dr. Naushad indicated that plaintiff needed an MRI of the lumbar spine, but it appeared to him that plaintiff had nerve impingement and required surgery. (Tr. 239-40). He prescribed Percocet, Flexeril,[24] Neurontin, and Tramadol. (Tr. 240).

Plaintiff saw Dr. Naushad on February 8, 2008, for a follow-up regarding her lower back pain. (Tr. 242). Dr. Naushad noted that plaintiff was stable on medication. (Id.). Plaintiff rated her pain

---

[21]Paxil is a psychotropic drug indicated for the treatment of depression and anxiety. See PDR at 1586.

[22]Lexapro is indicated for the treatment of major depressive disorder. See PDR at 1282.

[23]Disorder of the spinal nerve roots. Stedman's at 1622.

[24]Flexeril is indicated for the relief of muscle spasm associated with acute, painful musculoskeletal conditions. See PDR at 1931.

as a seven on a scale of one to ten. (Tr. 245). She indicated that the Percocet was helping and was improving her daily functioning and sleep. (Id.). Dr. Naushad's assessment and restrictions remained the same. (Id.).

Plaintiff saw Dr. Naushad on March 10, 2008, at which time plaintiff complained of increased pain in the center of the lumbar spine around L5-S1, and right leg radiation. (Tr. 246). Plaintiff indicated that the Percocet was helping but it was not strong enough. (Tr. 249). Dr. Naushad's assessment and restrictions remained the same. (Id.). Dr. Naushad increased plaintiff's Percocet, and discontinued the Flexeril. (Id.).

Plaintiff saw Dr. Naushad on April 11, 2008, at which time Dr. Naushad noted that plaintiff's pain was mostly localized and very tender around the facet joints. (Tr. 259). Plaintiff reported that the Percocet was improving her pain and improving her daily functioning and sleep. (Tr. 262). Dr. Naushad indicated that an MRI of the lower lumbar spine revealed facet arthropathy with no bulging disc or herniation. (Id.). Dr. Naushad's assessment was lumbar discogenic pain, lumbar facet arthropathy, muscle spasms, and myofacial pain. (Id.). He started plaintiff on the Lidoderm patch. (Id.).

Plaintiff saw Dr. Naushad on May 12, 2008, at which time plaintiff reported increased pain with right radiculopathy. (Tr. 264). Plaintiff rated her pain as a ten. (Tr. 267). Dr. Naushad's assessment remained the same. (Id.). Dr. Naushad discontinued the Percocet and Tramadol, started plaintiff on Vicodin and Motrin, and scheduled lumbar epidural injections. (Id.).

Plaintiff saw Dr. Naushad on June 16, 2008, at which time plaintiff reported that the lumbar epidural injection did not improve her back pain. (Tr. 268). Plaintiff rated her pain as a six to seven. (Tr. 271). Plaintiff reported that the Vicodin was helping. (Id.). Dr. Naushad discontinued the

epidural injections, continued the Vicodin, and started plaintiff on Baclofen.[25]  (Id.).

Plaintiff saw Dr. Naushad on July 14, 2008, at which time plaintiff reported that the Vicodin was helping and improving her daily functioning and sleep.  (Tr. 275).  Plaintiff rated her pain level as a four.  (Id.).  Plaintiff indicated that she received some relief from the last epidural injection.  (Id.).  Dr. Naushad continued plaintiff's medication regimen.  (Id.).

Plaintiff presented to the Advanced Pain Center on August 11, 2008.  (Tr. 277).  Xiaohui Fan, M.D. refilled plaintiff's medications.  (Tr. 278).

Plaintiff saw Dr. Fan on September 8, 2008, at which time plaintiff reported that her medications were not strong enough.  (Tr. 281).  Dr. Fan increased plaintiff's Tramadol and continued the Vicodin.  (Id.).

Dr. Fan performed a lumbar medial branch block on October 1, 2008.  (Tr. 33).

Plaintiff presented to Lisa Akers, FNPC, at Dr. Fan's office on October 6, 2008, at which time plaintiff complained of neuropathy on the bottoms of both feet and muscle spasms.  (Tr. 282).  Plaintiff indicated that the medial branch block injection she received the prior week left her feeling weak.  (Id.).  Ms. Akers increased plaintiff's Neurontin and recommended that plaintiff undergo another injection.  (Tr. 284).

On October 15, 2008, plaintiff presented to Dr. Fan, at which time she reported that the previous medial branch block had decreased her pain by about fifty percent.  (Tr. 24).  Dr. Fan performed another lumbar medial branch block.  (Tr. 25).

Plaintiff saw Ms. Akers on November 3, 2008, at which time she reported that the last

---

[25]Baclofen is a muscle relaxer indicated for the treatment of muscle spasms.  See PDR at 3296.

injection helped her. (Tr. 20). Plaintiff indicated that she was sleeping with the Ambien. (Tr. 22). Plaintiff stated that her activities of daily living were worsening. (Id.). Ms. Akers increased plaintiff's Neurontin and recommended that plaintiff undergo another medial branch block for facet arthropathy. (Id.).

Plaintiff saw Dr. Fan on December 1, 2008, at which time she complained of chronic weakness in the left leg, which had been worse recently and resulted in some falls. (Tr. 16). Plaintiff reported that the medial branch block helped on the right side but did not help the left side. (Tr. 18). Dr. Fan noted that the Percocet helped plaintiff get around and be active. (Tr. 19). Dr. Fan continued the Percocet and recommended that plaintiff undergo another medial branch block on the left side. (Tr. 19). He also recommended a neurology consult for left leg weakness. (Id.).

Dr. Fan performed a lumbar medial branch block on December 10, 2008. (Tr. 12-14).

Plaintiff presented to Dr. Fan on December 19, 2008, at which time plaintiff reported that her pain was going down to her thighs at times and that the left medial branch block did not help. (Tr. 9). Plaintiff rated her pain as a nine. (Id.). Dr. Fan noted that plaintiff's pain was helped by Vicodin, and that plaintiff had no new side effects. (Tr. 11). Dr. Fan continued the Vicodin. (Id.).

Plaintiff presented to Dr. Fan on January 19, 2009, at which time she rated her pain as a six. (Tr. 6). Dr. Fan continued the Vicodin. (Tr. 8).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since November 8, 2006, the application date (20 CFR 416.920(b) and 416.971 *et seq.*).

2.    The claimant has the following severe impairment: Disorders of the spine (20 CFR 416.920(c)).

- 18 -

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry 10 pounds, both occasionally and frequently; sit (with usual breaks) for about 6 hours in an 8 hour workday; and stand and/or walk (with usual breaks) for about 2 hours in an 8 hour workday.  The claimant is occasionally able to climb stairs and ramps.  The claimant is unable to climb ropes, ladders and scaffolding.  The claimant is occasionally able to kneel, crouch and stoop.  The claimant is unable to crawl. The claimant is able to occasionally reach overhead.

5.    The claimant is unable to perform any past relevant work (20 CFR  416.965).

6.    The claimant was born on December 8, 1969 and was 36 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education and is able to communicate in English.  (20 CFR 416.964).

8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since November 8, 2006, the date the application was filed (20 CFR 416.920(g)).

(Tr. 85-90).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income protectively filed on November 8, 2006, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 90).

- 19 -

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

### B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the

claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must

indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. <u>See</u> 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. <u>See id.</u> Next, the Commissioner must determine the severity of the impairment based on those ratings. <u>See</u> 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. <u>See</u> 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. <u>See id.</u> If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. <u>See</u> 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.    <u>Plaintiff's Claims</u>**

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff next argues that the ALJ erred in assessing the credibility of plaintiff's subjective complaints of pain and limitations. Plaintiff also contends that the hypothetical question presented to the vocational expert was flawed. The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's credibility assessment.

1. **Credibility Assessment**

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible. Defendant contends that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is

whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In his opinion, the ALJ properly pointed out <u>Polaski</u> factors and other inconsistencies in the record that detract from plaintiff's complaints of disabling pain. (Tr. 88-89). The ALJ first found that the objective medical evidence is not supportive of plaintiff's allegations of disability. (Tr. 17-19). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. <u>See</u> <u>Curran-Kicksey v. Barnhart</u>, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ first discussed the lumbosacral MRI plaintiff underwent in August of 2006. (Tr. 85). The ALJ noted that this MRI revealed diffuse facet arthropathy, with no significant disc bulge, herniations, or stenosis. (Tr. 85, 184). The ALJ properly considered the minimal findings on imaging of plaintiff's lumbar spine.

The ALJ next discussed the findings of consultative examiner Dr. Naseer. (Tr. 86). Plaintiff saw Dr. Naseer for a neurological examination in January of 2007. (Tr. 203-07). Although Dr. Naseer noted moderate limitation of range of motion of the lumbar spine, the remainder of the examination was unremarkable. (Tr. 86, 203-07). Significantly, Dr. Naseer noted that plaintiff used no assistive device, had no difficulty getting on and off the examination table, had a normal gait, normal motor and sensory exam, no evidence of sensory deficit, and negative straight leg raising test. (<u>Id.</u>). Dr. Naseer diagnosed plaintiff with chronic back pain and expressed the opinion that plaintiff was able to use her hands for fine finger functions; ambulate without any assistive device; sit, stand and walk; and lift, carry, and handle objects. (Tr. 86, 204).

The ALJ also discussed the records from the Advanced Pain Center. (Tr. 86). The ALJ noted that the examination findings have generally been unremarkable other than report of some tenderness and a positive straight leg raise test. (Tr. 86, 238). He pointed out that plaintiff was described as possessive of normal muscle strength, normal reflexes, and normal sensation. (Id.). The ALJ stated that, although there was some evidence of spasms on examination in April of 2008, this finding appears to have been isolated. (Tr. 86, 262). Further, the ALJ noted that physicians from the Advanced Pain Center found that plaintiff was capable of lifting fifteen to twenty pounds, which was consistent with the ALJ's residual functional capacity determination. (Tr. 86).

The ALJ next discussed plaintiff's daily activities. (Tr. 88). The ALJ noted plaintiff's testimony that she cares for her children, prepares meals, cleans her household, does laundry, drives a car, shops in stores, manages money, sews, and attends church services. (Tr. 88-89, 57-59). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). The ALJ properly found that plaintiff's ability to engage in these activities detracted from her allegations of disability.

The ALJ also discussed plaintiff's work history. (Tr. 89). The ALJ stated that plaintiff's earnings record for the past fifteen years reveals nominal or no earnings in all years. (Id.). The ALJ found that plaintiff's poor work history detracts from a finding that disability is the cause of her present inability to work. (Id.). Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence. Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 2.    **Residual Functional Capacity**

Plaintiff argues that the ALJ erred in formulating her residual functional capacity. Specifically, plaintiff contends that, in determining plaintiff's residual functional capacity, the ALJ ignored significant medical evidence.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may

consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence.  See Lauer**,** 245 F.3d at 704.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry 10 pounds, both occasionally and frequently; sit (with usual breaks) for about 6 hours in an 8 hour workday; and stand and/or walk (with usual breaks) for about 2 hours in an 8 hour workday.  The claimant is occasionally able to climb stairs and ramps.  The claimant is unable to climb ropes, ladders and scaffolding.  The claimant is occasionally able to kneel, crouch and stoop.  The claimant is unable to crawl.  The claimant is able to occasionally reach overhead.

(Tr. 88).

Plaintiff contends that, in determining plaintiff's residual functional capacity, the ALJ ignored significant evidence in the record, including plaintiff being administered nerve blocks, taking strong pain medication, the results of a nerve conduction study demonstrating nerve damage on the left side, and experiencing symptoms of depression.  Although the ALJ did not discuss this particular evidence, he was not required to mention each piece of evidence.  See Wheeler v. Apfel, 224 F.3d 891, 895 n. 3 (8th Cir. 2000); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) ("[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted..[and] [a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered").

Plaintiff first contends that the ALJ ignored evidence from the Advanced Pain Center that plaintiff received epidural nerve blocks and took strong pain medication.  The ALJ did discuss findings from the Advanced Pain Center.  (Tr. 86).  As discussed above, the ALJ noted that the objective findings from Drs. Naushad and Fan were minimal.  Further, although plaintiff was

prescribed strong medication and received nerve blocks, Drs. Naushad and Fan expressed the opinion that plaintiff was capable of lifting twenty pounds. (Tr. 239). This is consistent with the ALJ's residual functional capacity determination. As such, plaintiff's argument that the ALJ committed reversible error in failing to discuss findings from the Advanced Pain Center lacks merit.

Plaintiff next argues that the ALJ failed to mention findings from a nerve conduction study demonstrating nerve damage on the left side, and that plaintiff experienced symptoms of depression. Although this study is mentioned in the records of Dr. Tindall and in a physical therapy evaluation, the study is not included in the record. As such, the ALJ did not err in failing to discuss the findings from the study.

Plaintiff finally argues that the ALJ failed to discuss plaintiff's symptoms of depression. Dr. Tindall diagnosed plaintiff with depression in February of 2006 and again in October of 2007. (Tr. 195, 235). The ALJ noted Dr. Tindall's diagnosis of depression but concluded that the record failed to longitudinally evidence persistence of such an emotional state. (Tr. 86). The ALJ stated that plaintiff did not receive regular psychiatric or psychological care and no mental condition has necessitated emergency or inpatient care. (Id.). The ALJ, therefore, properly concluded that plaintiff did not suffer from a serious mental impairment. (Tr. 87).

The undersigned finds that the ALJ's residual functional capacity determination is supported by substantial evidence. The ALJ performed a proper credibility analysis and found that plaintiff's subjective complaints were not entirely credible. The objective findings of plaintiff's treating physicians were minimal. The ALJ's residual functional capacity determination is supported by the opinions of plaintiff's treating pain management physicians, Drs. Naushad and

Fan, who found that plaintiff was capable of lifting twenty pounds. The ALJ's determination is also supported by the findings of consulting physician Dr. Naseer. Although plaintiff clearly suffers from pain, the evidence does not support the presence of any greater limitations due to her pain than those found by the ALJ.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 3.    <u>Vocational Expert Testimony</u>

Plaintiff also contends that the hypothetical question presented to the vocational expert was flawed because it did not capture the concrete consequences of plaintiff's impairments. Specifically, plaintiff argues that the hypothetical question did not include limitations to account for plaintiff's pain.

Testimony from a vocational expert based on a properly phrased hypothetical question constitutes substantial evidence upon which to base an award or denial of Social Security benefits. <u>See</u> <u>Howard v. Massanari</u>, 255 F.3d 577, 582 (8th Cir. 2001). "A hypothetical question posed to [a] vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." <u>Hunt v. Massanari</u>, 250 F.3d 622, 625 (8th Cir. 2001). It must "capture the concrete consequences of the claimant's deficiencies." <u>Id.</u> (citing <u>Taylor v. Chater</u>, 118 F.3d 1274, 1278 (8th Cir. 1997)).

In this case, the undersigned has found that the ALJ's residual functional capacity assessment is supported by substantial evidence. The ALJ included significant restrictions, both exertional and non-exertional, as a result of plaintiff's pain. The hypothetical question posed to the vocational expert included the limitations the ALJ found in his residual functional capacity

determination. As such, the vocational expert's opinion regarding plaintiff's ability to perform other jobs in the national economy is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's applications for Supplemental Security Income under Title XVI of the Social Security Act be **affirmed**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this  12th   day of July, 2010.


_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE